UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK



ANGELO ARENA,

CASE NO.

Plaintiff,

**COMPLAINT FOR CIVIL MONEY**

**PENALTIES AND DEMAND FOR JURY**

v.

**TRIAL**

JPMORGAN CHASE & CO.

[Article 6 of the New York State Labor Law, Article

15 of the New York State Executive Law, Breach of

Defendant.

Covenant of Good Faith and Fair Dealing,

Intentional Infliction of Emotional Distress, and

Negligence]

COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT FOR CIVIL MONEY PENALTIES**

Table of Contents

I. Introduction ........................................................... 1

II. Relevant Law ........................................................ 1

III. Jurisdiction and Venue ......................................... 3

IV. Parties ................................................................. 3

V. Background ........................................................... 3

VI. Claims for Relief .................................................. 15

VII. Prayer for Judgement ........................................... 16

*i*

Plaintiff, Angelo Arena ("Mr. Arena"), alleges and complains against defendant, JPMorgan Chase & Co. ("JPMorgan"), as follows:

## I.   INTRODUCTION

1.   Mr. Arena brings this action pursuant to Article 6 of the New York State Labor Law, Article 15 of the New York State Executive Law, Breach of Covenant of Good Faith and Fair Dealing, Intentional Infliction of Emotional Distress, and Negligence, to recover civil money penalties from defendant for: (1) the negligence on behalf of JPMorgan in (a) not properly investigating Mr. Arena's discrimination, theft, and harassment claims and in (b) the manner in which JPMorgan failed to conduct their business in accordance with New York State law, of which resulted in direct harm to Mr. Arena, (2) the intentional and outrageous conduct on behalf of JPMorgan and against Mr. Arena, of which resulted in direct harm to Mr. Arena, (3) the failure by JPMorgan to pay Mr. Arena his sales commission when it was earned, as required by New York State Labor Law § 191(c), (4) the failure by JPMorgan to to pay Mr. Arena his retirement benefit, as required by New York State Labor Law § 198-c(1), and (5) the obvious bad faith and unfair dealings on behalf of JPMorgan in executing their employment contract with Mr. Arena.

## II.   RELEVANT LAW

2.   Article 6 of the New York State Labor Law

    a.   New York State Labor Law § 191(c) states, "(1) When a contract between a principal and a sales representative is terminated, all earned commissions shall be paid within five business days after termination or within five business days after they become due in the case of earned commissions not due when the contract is terminated. (2) The earned commission shall be paid to the sales representative at the usual place of payment unless the sales representative requests that the commission be sent to him or her through the mail. If the commissions are sent to the sales representative by mail, the earned commissions shall be deemed to have been paid as of the date of their postmark for purposes of this section. (3) A principal who fails to comply with the provisions of this section concerning timely payment of all earned commissions shall be liable to the sales representative in a civil action for double damages. The prevailing party in any such action shall be entitled to an award of reasonable attorney's fees, court costs, and disbursements."

    b.   New York State Labor Law § 198(c)(1) states, "In addition to any other penalty or

punishment otherwise prescribed by law, any employer who is party to an agreement to pay or provide benefits or wage supplements to employees or to a third party or fund for the benefit of employees and who fails, neglects or refuses to pay the amount or amounts necessary to provide such benefits or furnish such supplements within thirty days after such payments are required to be made, shall be guilty of a misdemeanor, and upon conviction shall be punished as provided in section one hundred ninety-eight-a of this article. Where such employer is a corporation, the president, secretary, treasurer or officers exercising corresponding functions shall each be guilty of a misdemeanor." New York State Labor Law § 198(c)(2) states, "As used in this section, the term "benefits or wage supplements" includes, but is not limited to, reimbursement for expenses; health, welfare and retirement benefits; and vacation, separation or holiday pay."

3.   Article 15 of the New York State Executive Law

a.   New York State Executive Law § 296(3-a)(a) states, "It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency to refuse to hire or employ or license or to bar or to terminate from employment an individual eighteen years of age or older, or to discriminate against such individual in promotion, compensation or in terms, conditions, or privileges of employment, because of such individual's age."

b.   New York State Executive Law § 297(9) states, "Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages … and such other remedies as may be appropriate, including any civil fines and penalties provided in subdivision four of this section…"

4.   Breach of Covenant of Good Faith and Fair Dealing

a.   According to Legend Autorama, Ltd. v Audi of Am., Inc., 100 A.D.3d 714 [2012], "Implicit in every contract is a covenant of good faith and fair dealing, which encompasses any promise that a reasonable promisee would understand to be included. The covenant embraces a pledge that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" (*Dalton v Educational Testing Serv.,* 87 NY2d at 389)."

5.   Intentional Infliction of Emotional Distress

a.   Under New York law, there are four elements required to support a claim for

2

COMPLAINT

intentional infliction of emotional distress: (1) extreme and outrageous conduct, (2) intent to cause, or disregard of a substantial probability of causing, severe emotional distress, (3) a causal connection between the conduct and injury, and (4) severe emotional distress (see Howell v New York Post Co., 81 NY2d 115 [1993]).

6.   Negligence

a.   Under New York law, there are three elements required to support a claim for negligence: (1) a plaintiff must demonstrate the existence of a duty, (2) a breach of that duty, and (3) that the breach of such duty was a proximate cause of his or her injuries (see Wendt v. Bent Pyramid Prods., LLC, 108 A.D.3d 1032 [2013]).

b.   Further, According to States v. Lourdes Hosp., 100 N.Y.2d 208, 210 (N.Y. 2003), "Under appropriate circumstances, the evidentiary doctrine of res ipsa loquitur may be invoked to allow the factfinder to infer negligence from the mere happening of an event (see Restatement [Second] of Torts § 328D). Res ipsa loquitur, a doctrine of ancient origin (see Byrne v Boadle, 2 H & C 722, 159 Eng Rep 299 [1863]), derives from the understanding that some events ordinarily do not occur in the absence of negligence (id.; see also Dermatossian v New York City Tr. Auth., 67 N.Y.2d 219, 226 [1986]). In addition to this first prerequisite, plaintiff must establish, second, that the injury was caused by an agent or instrumentality within the exclusive control of defendant and, third, that no act or negligence on the plaintiff's part contributed to the happening of the event (see Ebanks v New York City Tr. Auth., 70 N.Y.2d 621, 623 [1987]). Once plaintiff satisfies the burden of proof on these three elements, the res ipsa loquitur doctrine permits the jury to infer negligence from the mere fact of the occurrence."

## III.   JURISDICTION AND VENUE

7.   Pursuant to 28 U.S. § 1332, this Court has jurisdiction over the subject matter of this action.

8.   Venue is appropriate in this judicial district pursuant to 28 U.S.C § 1391(b)(1), (b)(2), (c) & (d), because defendant transacts significant business within this district and therefore is subject to personal jurisdiction in this district and because all events giving rise to the claims alleged occurred in this district.

## IV.   PARTIES

9.   Plaintiff is Angelo Arena.

10.   Defendant JPMorgan Chase & Co. is a domestic financial holding company that is a Delaware

3

COMPLAINT

corporation registered to conduct business within New York State and maintains its principal place of business at 270 Park Avenue, New York, NY 10017.

## V.   BACKGROUND

11.   Mr. Arena was employed by JPMorgan from October 2006 through January 2007 and again from August 2010 through May 2013, which was immediately subsequent to Mr. Arena completing his university education. In total, Mr. Arena was employed by JPMorgan for two years and three hundred twenty two days.

12.   As of May 01, 2013, Mr. Arena's job title was Private Client Banker.

13.   In 2012 and 2013, Mr. Arena was awarded President's Club Status, which is only awarded to 100 Private Client Bankers out of over 1550 competing Private Client Bankers nationwide.

14.   As of March 31, 2013, Mr. Arena ranked 9th out of 1550 competing Private Client Bankers with respect to Mr. Arena's sales achievements.

15.   In late March 2013, Mr. Arena completed a banking transaction for his client ("Client A") and as a result of the said transaction, Mr. Arena was due sales commission in accordance with the "JPMorgan Chase Private Client Banker Sales Commission Plan" ("Commission Plan").

16.   The amount of the sales commission due to Mr. Arena was $1,216.33.

17.   After completing the said banking transaction for Client A, Mr. Arena was approached by his direct manager, Maen Jariri ("Mr. Jariri"), regarding the sales commission for the transaction.

18.   Mr. Jariri stated to Mr. Arena that Mr. Arena was "too young to be so successful" and because Mr. Jariri was older than Mr. Arena, Mr. Arena should be making less than him. Mr. Jariri attempted to force Mr. Arena into giving Mr. Jariri the sales commission that Mr. Arena earned. In doing so, Mr. Jariri stated that Mr. Arena "must reassign" the sales commission to a different Private Client Banker ("Banker A"), who was a friend of Mr. Jariri's, and Banker A would then pay Mr. Jariri the funds. Mr. Arena was then threatened that if he told anyone about their interaction or failed to do what Mr. Jariri told him to do, Mr. Arena's career would be "intentionally destroyed."

19.   Mr. Arena did not "reassign" the sales commission and in early April 2013 after enduring daily harassment by Mr. Jariri to follow his demands, Mr. Arena made it clear to Mr. Jariri that Mr. Arena would not accept his illegal, discriminatory, fraudulent, and corrupt desires and that such constant

4

harassment was causing emotional harm for Mr. Arena and preventing Mr. Arena from performing his

responsibilities as a Private Client Banker, whereby hindering Mr. Arena's future success. Mr. Jariri

laughed at Mr. Arena and did not respond. In the next few subsequent days, Mr. Arena discovered that the

said sales commission was missing from his Sales Commission Report. Mr. Arena approached Mr. Jariri

regarding the missing sales commission and Mr. Jariri told Mr. Arena that "he took care of it." Therefore,

as a result of Mr. Arena's refusal to fall victim to Mr. Jariri's illegal demands, Mr. Jariri, with the access he

possessed as Mr. Arena's direct manager, assigned the sales commission to Banker A without Mr. Arena's

consent or knowledge. Mr. Arena immediately requested to meet with Mr. Jariri's manager, Vanessa

Lewter ("Ms. Lewter") and a member of Human Resources to discuss the outrageous conduct on behalf of

Mr. Jariri and to ensure that Mr. Arena would be compensated for his diligent work, of which resulted in

the sales commission. Unfortunately, instead of Ms. Lewter or Human Resources returning Mr. Arena's

telephone calls, both party's contacted Mr. Jariri, which is negligent to say the least. In doing so, this

promoted Mr. Jariri to become highly retaliatory against Mr. Arena. Mr. Jariri approached Mr. Arena and

stated "no meetings will be held." Instead, Mr. Jariri refused Mr. Arena access to Mr. Arena's office,

telephone, and sales materials, all of which are needed to complete Mr. Arena's most basic job functions.

Such intentional infliction of harm upon Mr. Arena had the immediate effect of making it impossible for

Mr. Arena to succeed and was only setting him up for failure, of which Mr. Jariri intended and sought.

Further, as a result of Ms. Lewter and Human Resources only making matters worse, Mr. Arena had

nobody to report the outrageous conduct to. Ms. Lewter and Human Resources gave Mr. Jariri the green

light for his further outrageous conduct. It is important to note that JPMorgan has a Code of Conduct, of

which contains a "policy" for the process when an employee contacts Human Resources. In particular, it

states, "Code of Conduct Reporting Hotline - What Happens When You Contact the Hotline? (1) The

information you report will be sent to JPMorgan Chase's internal investigations units for appropriate

follow-up. (2) Reports are handled promptly and discreetly. (3) Retaliation for reporting in good faith is

strictly prohibited and will not be tolerated. Our integrity and reputation depend on our ability to do the

right thing, even when it's not the easy thing." This process was obviously not followed. Further, this was

the first time that Mr. Arena ever needed to contact Human Resources and it quickly became clear that the

clear JPMorgan Code of Conduct policies were nothing more than a gimmick designed to prevent liability

COMPLAINT

for JPMorgan by devastating the complaining employee. Mr. Arena never heard back from Ms. Lewter or Human Resources.

20.   Mr. Arena did not resist Mr. Jariri's requests, as doing so wouldn't produce any benefits to Mr. Arena. Instead, Mr. Arena continued to attempt to contact Human Resources and Ms. Lewter throughout the month of April 2013 with the purpose of (1) conducting a meeting with Ms. Lewter and Human Resources to discuss Mr. Jariri's outrageous behavior and to ensure that Mr. Arena would receive his sales commission, of which was the result of his diligent efforts, (2) have an official and formal investigation conducted, and (3) put an immediate end to the extreme harassment and retaliation that Mr. Arena was enduring while at his place of employment. Unfortunately, each time that Mr. Arena contacted Ms. Lewter and Human Resources to express his concerns, the discrimination and harassment towards Mr. Arena by Mr. Jariri only became worse. Neither Ms. Lewter or Human Resources returned Mr. Arena's telephone calls and instead, they once again contacted Mr. Jariri. Mr. Jariri retaliated against Mr. Arena by threatening Mr. Arena that he was "going to be fired" if he "did not stop making calls [to Ms. Lewter and Human Resources]." In light of this, Mr. Arena made over ten attempts to contact Ms. Lewter and Human Resources throughout the month of April 2013, but no one responded to Mr. Arena, no meeting occurred, and no action was taken.

21.   In accordance with the Commission Plan, Mr. Arena's sales commission of $1,216.33 was to be paid to Mr. Arena on April 30, 2013, but was not paid to Mr. Arena.

22.   As a direct result of JPMorgan's negligence, intentional infliction of emotional distress upon Mr Arena, extreme and outrageous harassment against Mr. Arena, failure to pay Mr. Arena his earned sales commission in accordance with the Commission Plan and New York State Labor Law § 191(c), Mr. Arena was faced with two options: (a) stay employed by JPMorgan and (1) have his reputation intentionally destroyed, (2) have additional monies stolen from him, (3) endure consistent threats, harassment, and discrimination, and (4) face termination as a result of Mr. Arena's desire to be paid in accordance with his contract with JPMorgan or (b) be in control of his life, put an end to the emotional harm being endured, and terminate his own employment. Mr. Arena decided on the latter, as any reasonable person would, and resigned effective May 01, 2013.

23.   Mr. Arena hand delivered his resignation letter to Mr. Jariri on May 01, 2013. Mr. Arena's

6

COMPLAINT

resignation letter was as follows:

> I have always had respect for J.P. Morgan Chase and although this image has been tainted by my experience at your branch, I realize the environment that exists in your branch is unique and inconsistent with what the company stands for. This is confirmed by me experience of working in multiple branches throughout the country and assisting with the opening of over 10 new build branches, which all embraced a much more positive and ethical environment.
>
> As a leader, you should be an advocate for those that demonstrate integrity and work ethic instead of encouraging, and then turning a blind eye to, the incentive handouts that occur within your branch. It is incomprehensible to think of why talent would be attracted to an environment in which success is measured by the number of handouts you receive. I would argue that handouts are a measure of failure. Talent should measure success. When I think of talent, I think of integrity and intellect. And if you have the first, you will not take a handout. Therefore, I cannot continue in this role as I have an over abundance of the first.
>
> One might ask, why don't you just ignore the unethical behavior and focus on your career? It's simple; I have tried this for 1.5 years and the result was that the incremental change over that time period had only worsened. Most recently, you found it appropriate to completely go against my compensation policy and assign my work to someone else based on zero merit. I can only conclude that the individual you assigned it to incentivized you in some manner, as this was unquestionably my work. Such actions are absurd and I refuse to tolerate them. I am passionate about my integrity and future and will not risk either over such foolishness.
>
> Effective May 01, 2013, I will be resigning.

24.   Within an hour of Mr. Arena hand delivering his resignation letter, Mr. Arena was immediately contacted via telephone by Ms. Lewter. Mr. Arena did not return the telephone call, as the damage had already been done and it was pointless to discuss the matter now. Ms. Lewter had a month to act in accordance with clear JPMorgan polices and ensure that Mr. Arena was treated like a dignified human

7

COMPLAINT

being. In addition to hand delivering his resignation letter to Mr. Jariri on May 01, 2013, Mr. Arena mailed copies of his resignation letter to James Dimon (CEO of JPMorgan), John Donnelly (Head of Human Resources at JPMorgan), Gordon Smith (CEO of Consumer and Community Banking at JPMorgan), and (4) Ryan McInerney (CEO of the Consumer Bank at JPMorgan). All letters were mailed via certified mail with return receipt. The resignation letter was accompanied by a personal letter that stated:

> Please find my resignation letter attached. It was hand delivered [to Mr. Jariri] on May 01, 2013. This letter is being sent with the hope that you will make a stand for integrity and eliminate the corruption within Chase. There is a serious issue with the culture being created and not only has it caused you to lose talent, but it is a recipe for disaster.

25.   Following Mr. Arena' resignation, several employees contacted Mr. Arena and disclosed to him that they had endured similar harassment from Mr. Jariri and were forced to "reassign" sales commission for similar reasons. Additionally, they stated to Mr. Arena that they thought of him as their "hero," as they knew Mr. Jariri's conduct was illegal and that the harassment they endured was extreme and outrageous to say the least, but they never spoke about it out of fear of being terminated after constant threats from Mr. Jariri that they would be terminated if they spoke about their interaction.

26.   Within one week of Mr. Arena's resignation, he was contacted by a JPMorgan "internal investigator" from Human Resources. The representative stated to Mr. Arena, "I am sorry it has taken us so long to call you back" and informed Mr. Arena that an investigation was being conducted on Mr. Arena's behalf. Mr. Arena made it clear that (1) JPMorgan had over one full month of warnings and concerned telephone calls from Mr. Arena and therefore, ample time to investigate the matter while Mr. Arena was employed by JPMorgan, but grossly failed to heed any of the warnings, (2) it shouldn't have taken Mr. Arena's resignation for JPMorgan to investigate such clear illegal and harassing conduct, (3) contacting Mr. Arena after his resignation only demonstrated JPMorgan's negligence and that JPMorgan was only conducting the investigation as a result of needing to go into damage control, of which Mr. Arena was not interested in wasting his time with, (4) the damage was already done to Mr. Arena, as he had already resigned from JPMorgan as a result of JPMorgan's failure to investigate and resolve the serious issues while Mr. Arena was employed, and (5) Mr. Arena demanded the immediate payment of his

8<br>COMPLAINT

missing sales commission, as required by New York State Labor Law § 191(c).

27.   In August 2013, Mr. Arena was contacted by a JPMorgan "internal investigator" with Human Resources who stated (1) Mr. Arena would be receiving a check for his sales commission owed to him from April 2013 and (2) as a result of the investigation, Mr. Jariri's employment had been terminated.

28.   In September 2013, Mr. Arena received a check for the sales commission that was owed to him from April 2013. The check amount was $1,216.33 and it explicitly stated that its purpose was for the sales commission earned in March 2013. Mr. Arena has copies of all correspondence received.

29.   Mr. Arena participated in the JPMorgan Chase Retirement Savings Plan ("Retirement Plan"). The Retirement Program is a defined benefit plan. According to The Retirement Plan Summary Plan Description (Retirement Plan Summary"):

> **Your Retirement Savings Program:** Participation in the Retirement Plan is automatic once you complete one year of total service. Your retirement Plan benefit is expressed as a cash balance benefit that grows in a notional bookkeeping in a notional bookkeeping account over time through pay credits and interest credits. For each month you work at JPMorgan Chase while eligible for the plan, the company will credit your account with a percentage of your eligible compensation - from 3% to 5%, depending on your completed years of service. Your account also grows each month with interest credits. And because your plan benefits are portable, you can take your vested Retirement Plan benefits with you when you leave JPMorgan Chase.

> **When Participation Ends:** Your participation in the plan ends when you or your beneficiary receives a lump sum distribution of your cash balance account.

> **Pay Credits:** Once you are a participant and for each subsequent month you work for JPMorgan Chase (or a subsidiary that has adopted the plan) and remain eligible, you will receive a pay credit to your cash balance account equal to a percentage of your eligible compensation, up to $100,000 annually.

9

COMPLAINT

**Interest Credits:** Your cash balance account also receives interest credits each month based on your account balance at the end of the previous month and the applicable interest credit rate. ... The annual interest credit rate for any year is currently based on the yield of the average one-year Treasury rate for the month of October of the prior calendar year, plus 1%, with a minimum annual interest credit rate of 4.5%. Based on the current formula, the interest credit rate for 2013 is 4.5%. The monthly interest credit rate is equal to one-twelfth of the annual interest credit rate. Interest credits end the day before you begin to receive distribution of your account balance. (please note that this is based on a one-year Treasury rate at historic lows)

**When You Are Vested:** Vesting means you have a non-forfeitable right to the value of your plan account. **In general**, you become 100% vested in the value of your Retirement Plan account after completing three years of total service. Your benefit can become 100% vested earlier if: (1) you die while an active employee; or (2) your employment ends because of an eligible termination. Please see "Important Terms" on page 23 for the definition of "Eligible Termination." (emphasis added) (please note there is no other statement in the Retirement Plan Summary that begins with "in general" and therefore, the ambiguity and discretion for alternatives to vesting was intentional.)

**Page 23 definition of "Eligible Termination": In general**, an eligible termination occurs if your employment is involuntarily terminated due to the permanent closing of a location, a reduction in force, corporation downsizing, or job elimination. (emphasis added) (please note there is no other definition in the Retirement Plan Summary, which includes fifteen definitions, that begins with "in general." This is the only definition that is ambiguous. All others are definitive and therefore, the ambiguity and discretion in describing "eligible terminations" was intentional.)

30.   In accordance with the Retirement Plan Summary, Mr. Arena was eligible for the Retirement

10

COMPLAINT

Plan and was accumulating a cash balance. Mr. Arena was earning an annual 3% pay credit based upon his total compensation (capped at $100,000 in total compensation annually). As of December 31, 2012, Mr. Arena had accumulated $4,379.49 in his Retirement Plan. Mr. Arena's total eligible compensation in 2013 was greater than $100,000 and therefore, his pay credit was $3,000.00 (3% of $100,000). With this said, Mr. Arena's account balance as of May 01, 2103 was $7,493.26 (factoring in the 0.375% (1/12th of 4.5%) interest rate per month for January, February, March, and April). As of February 01, 2015, the account balance is $8,107.17. When Mr. Arena turns 59 1/2, which would be the earliest that Mr. Arena would have accessed his Retirement Plan to avoid a early distribution penalty from the IRS, the account balance will be $35,789.60. JPMorgan inappropriately terminated Mr. Arena's Retirement Plan and regardless of the determination regarding the contractual verbiage, although the explicit verbiage of the Retirement Plan Summary leaves intentional ambiguity and discretion for individuals like Mr. Arena who have endured theft, harassment, discrimination, and consistent threats, the negligence that led to Mr. Arena's resignation is sufficient for a claim on these monies, as without such negligence, Mr. Arena would not only have received the Retirement Plan, but would have continued to build upon his enormous success that was the direct result of his diligent work everyday and dedication to his career.

31.   Mr. Arena contacted JPMorgan to inquire into his Retirement Plan after he resigned. In doing so, Mr. Arena was told that his Retirement Plan did not vest as a result of Mr. Arena completing 1,052 days of employment, instead of completing 1,095 days of employment. As a result of the ambitious definition of "eligible termination," On June 14, 2013 Mr. Arena mailed correspondence to John Donnelly ("Mr. Donnelly"), Head of Human Resources at JPMorgan, via certified mail with return receipt. In the letter, Mr. Arena requested clarification regarding the ambiguous definition provided for an "eligible termination" and that Mr. Arena felt the obvious and intended discretion left in the "in general" term should apply to terminations due to discrimination, harassment, theft, and threats.

32.   On August 14, 2013, two months after Mr. Arena sent his letter to Mr. Donnelly dated June 14, 2013, Mr. Arena received correspondence from Rosemary Ruggieri (Ms. Ruggieri"), whom stated that she was responding on behalf of Mr. Donnelly. Ms. Ruggieri stated that the "in general" verbiage that defined vesting on page nine of the Retirement Plan Summary was referring to the eligible terminations on page twenty-three of the Retirement Plan Summary. Ms. Ruggieri's explanation did not remotely answer Mr.

Arena's questions, nor did she provide an explanation of what would constitute "in general" that is used to define eligible terminations on page twenty-three. Further, by simply reading the definitions for vesting and eligible terminations as written, one can draw the conclusion that the "in general" verbiage is uncorrelated in that one does not trump nor take the place of the other and instead, they are correlated in that they both provide flexibility in there respective definitions. Again, no other statement or definition includes "in general" within the written contract titled the Retirement Plan Summary and therefore, it is obvious that the ambiguity was intended to leave flexibility to allow for discretion in creating alternative reasons for vesting or what defines eligible termination.

33.   As a result of Mr. Arena not receiving an answer to his very clear question, Mr. Arena wrote a second letter to Mr. Donnelly dated August 24, 2013. In this letter, Mr. Arena spelled out what defined vesting and eligible terminations and established that both have clear flexibility. Further, Mr. Arena asked for clarification of each, as Mr. Arena believed that termination that resulted from theft, discrimination, harassment, and threats was what the discretion in the "in general" was intended for. Mr. Arena did not receive a response.

34.   On February 29, 2012, Mr. Arena received the JPMorgan Non-Solicit Agreement, of which he was forced to accept as a condition of his employment with JPMorgan. In particular, the agreement states:

> **8. NON-SOLICITATION OF EMPLOYER'S CUSTOMERS:** (a) You understand and acknowledge that JPMC considers its clients and customer relationships important and valuable assets. Accordingly, in consideration of and as a condition of your employment, continued employment, access to trade secrets and Confidential Information, specialized training and mentoring, and other consideration provided herein, **you understand and agree for a period of twelve (12) months after your employment with JPMC terminates for any reason that you may not on your own behalf or that of any other persons or entities, directly or indirectly solicit or attempt to solicit, induce to leave or divert or attempt to induce to leave, initiate contact with or divert from doing business with JPMC, any then current customers, clients, or other persons or entities that were serviced by you or whose names became known to you by virtue of your employment with JPMC, or**

**otherwise interfere with the relationship between JPMC and such customers, clients, or other persons or entities.**

**10. SPECIAL CONDITIONS RELATING TO COVENANTS OF CONFIDENTIALITY AND NON-SOLICITATION:** (a) You acknowledge that the terms and conditions of Sections, 7, 8 and 9 of this Agreement incorporate and/or supplement the terms and conditions of your employment at JPMC and are reasonable and necessary to protect the valued business interest of JPMC and that you have received good and valuable consideration for entering into this Agreement. (b) Remedies. (i) INJUNCTIVE RELIEF. You specifically agree that any breach, evasion, violation or threatened violation of any term of Sections 7, 8, or 9 by you will cause immediate or irreparable injury to JPMC that cannot adequately be compensated by monetary damages. You further agree that it is reasonable and necessary for JPMC to seek immediate injunctive relief and/or specific performance in any court of competent jurisdiction for any breach, evasion, violation or threatened violation of any term of Sections 7, 8, or 9 by you. You specifically agree as well as to all other legal or equitable remedies and UTSA remedies, where applicable, to which JPMC may be entitled, including but not limited to the right to compel arbitration of disputes. (ii) ATTORNEY FEES and COSTS. If JPMC is (in its sole judgement) compelled to institute legal proceedings and/or arbitration to enforce this Agreement, you agree to reimburse JPMC for its actual attorney fees and other expenses incurred in the successful prosecution or settlement of such proceedings, in addition to its damages or other remedies.

35.   While employed by JPMorgan, Mr. Arena's office was located at One Chase Manhattan Plaza and as demonstrated by his success, Mr. Arena established many great relationships with clients. After leaving JPMorgan, Mr. Arena immediately sought to continue and advance his career in a similar position and at a similar financial institution. Unfortunately, when Mr. Arena interviewed with many different corporations, they all asked Mr. Arena about his non-compete agreement with JPMorgan and several

COMPLAINT

asked to see it. It quickly became clear that the non-compete agreement was material in deciding to hire Mr. Arena and the rationale of such companies is reasonable: (1) JPMorgan is the largest bank by assets in the United States of America, (2) JPMorgan is a financial institution with its beginning roots in New York City since September 01, 1799, (3) the small geographical footprint of Manhattan, and (4) JPMorgan has a banking center on nearly every corner of Manhattan. Most New Yorker's have a bank account or investment account with JPMorgan. Further, JPMorgan manages assets for many company 401k programs and when the participating employees retire or change employers, they generally rollover the assets to another financial institution. Mr. Arena's employment task would be to obtain client assets from other financial institutions and could not complete such a task as a result of the non-compete agreement. Mr. Arena could not be successful in a simpler role at a similar financial institution, as the non-compete agreement barred Mr. Arena from receiving client assets from JPMorgan, solicited or unsolicited. Mr. Arena was unable to gain employment, as discussions with prospective employers ceased after Mr. Arena told the potential employer of the JPMorgan non-complete agreement when asked. Mr. Arena suffered a twelve month financial loss as a result of the outrageous conduct on behalf of JPMorgan and their clear negligence. Further, Mr. Arena is less marketable today as a result of being out of work for the extend period of time. As a result of Mr. Arena being unsuccessful in gaining employment, Mr. Arena decided to begin law school in the fall of 2014. The negative effects of the gap in his employment still persists today. In the preceding twelve months of Mr. Arena's employment prior to his resignation on May 01, 2013, Mr. Arena earned $202,452.10.

36.   Regarding JPMorgan's breach of their covenant of good faith and fair dealing with Mr. Arena, JPMorgan's Non-Solicit Agreement states the following;

> **3. DUTY OF LOYALTY TO ACT IN GOOD FAITH:** (a) You understand that at all times while you are an employee of JPMC: (i) You owe JPMC a duty of loyalty and a duty to act in good faith.

Because Mr. Jariri, Ms. Lewter, and Human Resource employees breached their duty of good faith as required by the Code of Conduct, JPMorgan has breached the covenant of good faith and fair dealings with Mr. Arena.

37.   On October 24, 2013, Mr. Arena commenced litigation against JPMorgan in the New York

14

COMPLAINT

County Civil Court to recover Mr. Arena's Retirement Plan. On January 16, 2014, JPMorgan mailed Mr. Arena a Notice of Removal, in which JPMorgan sought to move the case to the United Sates District Court for the Southern District of New York pursuant to 28 U.S.C. § 1441. Appearance of Mr. Arena and JPMorgan was required in the New York Civil Court on April 10, 2014. On April 09, 2014, JPMorgan submitted an adjournment request and the matter was adjourned. The case was then adjourned by JPMorgan again in August 2013. The matter was scheduled to be heard on November 06, 2014 and it was made clear that no further adjournment requests would be accepted by the court. It is unclear as to why the case was never transferred to federal court at JPMorgan's request, but it is clear that the adjournment requests were a stalling tactic, of which wasted nearly one year. In September and October 2014, Mr. Arena and JPMorgan engaged in discussions regarding a settlement, but the discussions did not materialize, as JPMorgan sought to have Mr. Arena sign a release agreement, of which was not a standard release agreement by any means, but instead substantially burdened Mr. Arena's life and was extremely detrimental to Mr. Arena's future career in the legal profession. As a result of settlement discussions not materializing and as a result of by October 2014 Mr. Arena had already endured the additional harm of being unable to gain employment as a result of the JPMorgan non-compete agreement, of which directly resulted in a loss of income and was detrimental to Mr. Arena's career, at Mr. Arena's request, the matter was dismissed by the court without prejudice in anticipation of Mr. Arena filing this complaint.

38.    The harm inflicted upon Mr. Arena does not occur without negligence. Mr. Arena has been forced to attempt to rebuild his life. The injustice inflicted upon Mr. Arena has caused him great humiliation. Mr. Arena is an honorable, ethical, humble, and dignified individual, whom did not deserve such outrageous and substantial harm being intentionally inflicted upon him and his successful career. Mr. Jariri's conduct was negligent and outrageous and when Mr. Arena sought assistance to remedy such conduct, he was ignored by Ms. Lewter and Human Resources, while both parties instead contacted Mr. Jariri and only inflamed the retaliation by Mr. Jariri against Mr. Arena through increased harassment and threats. The harm perpetrated upon Mr. Arena severely damaged his career and current/future income abilities. Mr. Arena's income had doubled year over year while employed by JPMorgan and was only increasing as his success grew. The results of the investigation conducted by JPMorgan and the subsequent actions taken by JPMorgan, which included Mr. Arena being paid the missing sales commission and Mr.

COMPLAINT

Jariri being terminated, demonstrate a clear admission of guilt on behalf of JPMorgan to their obvious negligence and intentional harm inflicted upon Mr. Arena.

## VI.   CLAIMS FOR RELIEF

A.   Article 6 of the New York State Labor Law

39.   Plaintiff incorporate the allegations contained in paragraphs 1-38 above.

40.   Mr. Arena is entitled, and seeks, to recover a civil money penalty against defendant in an amount assessed by the Court.

B.   Article 15 of the New York State Executive Law

41.   Plaintiff incorporate the allegations contained in paragraphs 1-38 above.

42.   Mr. Arena is entitled, and seeks, to recover a civil money penalty against defendant in an amount assessed by the Court.

C.   Breach of Covenant of Good Faith and Fair Dealing

43.   Plaintiff incorporate the allegations contained in paragraphs 1-38 above.

44.   Mr. Arena is entitled, and seeks, to recover a civil money penalty against defendant in an amount assessed by the Court.

D.   Intentional Infliction of Emotional Distress

45.   Plaintiff incorporate the allegations contained in paragraphs 1-38 above.

46.   Mr. Arena is entitled, and seeks, to recover a civil money penalty against defendant in an amount assessed by the Court.

E.   Negligence

47.   Plaintiff incorporate the allegations contained in paragraphs 1-38 above.

48.   Mr. Arena is entitled, and seeks, to recover a civil money penalty against defendant in an amount assessed by the Court.

## VII.   PRAYER FOR JUDGEMENT

WHEREFORE, Mr. Arena prays for judgement against defendant as follows:

A.   Assess civil money penalties against JPMorgan for their negligence, intentional infliction of emotional distress, discrimination, and breach of covenant of good faith and fair dealing that directly resulted in Mr. Arena being left with no other choice but to resign and caused direct and substantial harm

COMPLAINT

to Mr. Arena in the form of loss of income and the inability to gain employment due to the JPMorgan non-compete agreement, in the amount equal to Mr. Arena's preceding one year compensation of $202,452.10 plus interest, equal to no less than 8% compounded daily beginning May 01, 2013, totaling $232,871.77 as of January 31, 2015.

   B. Assess civil money penalties against JPMorgan for their, negligence, intentional infliction of emotional distress, discrimination, and breach of covenant of good faith and fair dealing that directly resulted in Mr. Arena being left with no other choice but to resign and caused direct and substantial harm to Mr. Arena through the loss of his Retirement Pan, in an amount equal to Mr. Arena's retirement Plan at age 59 1/2 of $35,789.60.

   C. Assess civil money penalties against JPMorgan for their failure to abide by New York State Labor Law § 191(c) in the amount that this Court deems just and proper, but for no less than $100,000.00, and per the requirements of Labor Law § 191(c), award Mr. Arena double damages plus reasonable attorney's fees, court costs, and disbursements.

   D. Assess civil money penalties against JPMorgan for their failure to abide by New York State Executive Law § 296(3-a)(a), which is recoverable under New York State Executive Law § 297(9), in an amount that this Court deems just and proper, but for no less than $500,000.00, for the perpetual and substantial harm that Mr. Arena has been forced to live with.

   E. All other relief this Court deems just and proper, including post-judgement interest, attorneys' fees and litigation fees as appropriate, and costs of this action.

DATED: January 14, 2015        Respectfully submitted,


ANGELO ARENA

Address:  PO Box 3800

      Jersey City, New Jersey 07303

Telephone: 201.744.5335

17

COMPLAINT

1

## DEMAND FOR JURY TRIAL

2

3        Plaintiff Angelo Arena hereby demands a trial by jury.

4

5   DATED: January 14, 2015                    Respectfully submitted,

6

7

8

9                                              ANGELO ARENA

10                                             Address:    PO Box 3800

11                                                         Jersey City, New Jersey 07303

12                                             Telephone: 201.744.5335

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT